United States District Court
Middle District of Florida
Jacksonville Division

**JASON A. JEFFERSON,**

  *Plaintiff,*

v.                NO. 3:17-CV-1162-J-PDB

**COMMISSIONER OF SOCIAL SECURITY,**

  *Defendant.*

---

# Order

  Jason Jefferson brings this action under 42 U.S.C. § 1383(c)(3) to review a final decision of the Commissioner of Social Security denying his application for supplemental security income. Under review is a decision by an Administrative Law Judge ("ALJ") dated September 23, 2016. Tr. 14–25. The alleged onset date is January 9, 2014. Tr. 14. Summaries of the law and the administrative record are in the ALJ's decision, Tr. 14–25, and parties' briefs, Docs. 22, 25, 28, and not fully repeated here.

  A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* If substantial evidence supports an ALJ's decision, a court must affirm, even if other evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "This restrictive standard of review applies only to findings of fact," and "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including

determination of the proper standard to be applied in reviewing claims." *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991) (quoted authority omitted).

Jefferson argues reversal is warranted for many reasons. Doc. 22. This order addresses each of Jefferson's arguments in turn.

## I.

In the decision, the ALJ found, "As pertinent to the alleged onset date, the objective evidence shows that the claimant has been able to ambulate effectively with the use of a prosthetic device." Tr. 17.

Jefferson argues the ALJ did not adequately consider whether he can "ambulate effectively" and, further, substantial evidence does not support the ALJ's finding he can "ambulate effectively." Doc. 22 at 8–13.

At step three of the sequential evaluation process, an ALJ must consider whether the claimant meets or equals a listing in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii) (2012). To meet a listing, an impairment must satisfy all criteria in the listing. 20 C.F.R. § 416.925(a) (2011). If a claimant meets or equals a listing, he is disabled, and progression through the sequential evaluation process ends. 20 C.F.R. § 416.920(a)(4)(iii) (2012).

Listing 1.05B (August 3, 2016, to September 28, 2016) considers amputation due to any cause where "[o]ne or both lower extremities at or above the tarsal region, with stump complications result[s] in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b, which have lasted or are expected to last for at least 12 months[.]" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, ¶ 1.05B (2016). Paragraph 1.00B2b provides:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete

2

activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. …

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, ¶ 1.00B2b (2016).

In discussing another listing that also requires an inability to ambulate effectively as defined in 1.00B2b (Listing 1.03), the ALJ found "the objective evidence shows that the claimant has been able to ambulate effectively with the use of a prosthetic device." Tr. 17.

Citing *Dunham v. Astrue*, 603 F. Supp. 2d 13, 19 (D.D.C. 2009), Jefferson argues, "By simply asserting 'the objective evidence shows that the claimant has been able to ambulate effectively with the use of a prosthetic device' without discussion (Tr. 17), the ALJ certainly did not adequately address whether Mr. Jefferson could ambulate effectively."[1] Doc. 22 at 10–11. At a minimum, the argument fails because

---

[1]The undersigned does not read Jefferson's brief to argue the ALJ erred in failing to specifically discuss whether Jefferson meets Listing 1.05B. *See generally* Doc. 22 at 8–13. In any event, that argument would fail. An ALJ need not mechanically recite evidence and may implicitly find a claimant fails to meet a listing. *Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986); *accord Anteau v. Comm'r of Soc. Sec.*, 708 F. App'x 611, 613 (11th Cir. 2017). The ALJ implicitly found Jefferson failed to meet Listing 1.05B: she set forth the law on step three, Tr. 15, conducted a step-three analysis, Tr. 17, found that Jefferson fails to meet at least one criterion of Listing 1.05B, Tr. 17, and proceeded past step three, Tr. 23–25.

the ALJ did not "simply" assert "the objective evidence shows that the claimant has been able to ambulate effectively with the use of a prosthetic device"; the ALJ detailed the evidence supporting that finding later in the decision, Tr. 19–23.

That evidence constitutes substantial evidence. The ALJ observed that Jefferson had been involved in a car accident in February 2014, which led to the amputation of his right leg below the knee. Tr. 19 (citing Exhibits 2F and 3F). The ALJ then discussed evidence of Jefferson's follow-up appointments and rehabilitation. Tr. 20–21. The evidence included August 2014 progress notes indicating Jefferson was having pain when wearing his prosthesis, the pain likely was caused by heterotopic ossification, and his prosthesis needed to be adjusted for size, but he possessed good muscle bulk, normal resting tone, and full muscle strength. Tr. 20 (citing Exhibit 10F). The evidence included September 2014 progress notes indicating Jefferson was doing better following adjustment of his prosthesis, was using his prosthesis five hours at a time, and was told he should be able to bear weight on his prosthesis for an entire day without pain or functional limitation. Tr. 20 (citing exhibit 10F). The evidence included January 2015 progress notes indicating Jefferson was doing well with his prothesis but needed a new one because of leg shrinkage, radiography revealed no acute osseous abnormality, and his right synostosis continued to improve. Tr. 20 (citing Exhibit 10F). And the evidence included an April 2015 report indicating Jefferson's prosthesis totally connected with the socket, the socket fit was comfortable and supportive, he was ambulating without discomfort, and he reported feeling nice. Tr. 20 (citing Exhibit 12F).

Jefferson presses a different take on this evidence, especially given his testimony, *see* Doc. 22 at 11–13, but the Court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment; it is enough that the ALJ applied the correct legal standards and substantial evidence supports her findings. *See Moore*, 405 F.3d at 1211.

II.

The ALJ found Jefferson has the residual functional capacity ("RFC") to perform light work with additional limitations: "lift and carry 20 pounds occasionally and 10 pounds frequently"; "stand/walk for about 6 hours and sit for up to 6 hours in an 8-hour workday with normal breaks"; "occasional climbing of ramps and stairs, occasional balancing, occasional stooping, occasional kneeling, occasional crouching, and occasional crawling"; "avoid climbing of ladders, ropes, and scaffolds"; "avoid concentrated exposure to the use of moving machinery and to unprotected heights"; and have "a sit/stand option, defined as allowing a person to sit or stand, alternately, at will, provided an individual is within employer tolerances for off task behavior." Tr. 17–18. Jefferson argues substantial evidence does not support the RFC for several reasons, Doc. 22 at 13–19, 23, each discussed below.

A.

The RFC found by the ALJ follows the RFC found by state-agency consultant Gloria Hankins, M.D., on July 25, 2014. *Compare* Tr. 17–18 *with* Tr. 73–75. After providing her opinion on Jefferson's RFC and detailing medical records, Dr. Hankins stated, "still in process of healing, projected rfc." Tr. 75.

Citing *Moody v. Barnhart*, 295 F. Supp. 2d 1278, 1285 (N.D. Ala. 2003), Jefferson argues the ALJ erred in relying on Dr. Hankins's July 2014 "projected" RFC. Doc. 22 at 14–15. Citing *Jacks v. Comm'r of Soc. Sec.*, 688 F. App'x 814, 821 (11th Cir. 2017), *Brown v. Comm'r of Soc. Sec.*, 442 F. App'x 507, 512 (11th Cir. 2011), and *Hogan v. Astrue*, No. 2:11cv237-CSC, 2012 WL 3155570, at *5 (M.D. Ala. Aug. 3, 2012) (unpublished), Jefferson further argues Dr. Hankins's opinion alone does not constitute substantial evidence to support the RFC. Doc. 22 at 15.

An ALJ may rely on the opinions of state medical consultants, who are highly qualified and whose opinions may be entitled to great weight if the evidence in the record supports them. Social Security Regulation ("SSR") 96-6p, 61 Fed. Reg. 34466,

5

1996 WL 362203 (July 2, 1996) (rescinded by SSR 17-2p, effective March 27, 2017). An ALJ may rely on an opinion of state medical consultants even when the consultant did not review all medical records. *See, e.g., Putman v. Comm'r of Soc. Sec.*, 705 F. App'x 929, 934 (11th Cir. 2017); *Stultz v. Comm'r of Soc. Sec.*, 628 F. App'x 665, 669 (11th Cir. 2015); *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013).

While it would have been improper for the ALJ to rely solely on Dr. Hankins's opinion, the ALJ did not. She relied on other evidence, including Jefferson's complete medical records, Jefferson's reports of daily activities, and Jefferson's work history. *See* Tr. 19–23. And although Dr. Hankins's opinion was a projection, there is no error in giving significant weight to the opinion considering the ALJ found it was "generally consistent with the overall evidence" and Dr. Hankins based the opinion on the impairment alleged (below-knee amputation of one leg), her expertise and experience as a doctor, and her consideration of medical records about the amputation and post-operation rehabilitation. *See generally* Tr. 70–75.

### B.

In the decision, the ALJ stated, "[Dr. Hankins] found that the claimant is not disabled, citing the objective medical record and course of treatment establishing a good response to the use of a prosthetic device, despite the occasional need for adjustment and modification of the device." Tr. 23.

Jefferson argues Dr. Hankins made no such finding. Doc. 22 at 16. While general, the ALJ's statement is a fair description of Dr. Hankins's opinion. Dr. Hankins found Jefferson not disabled, cited objective medical records, and explained, "improving—continues to ambulate as tolerated on his prosthesis—continues to report point tender[ne]ss," and "well fitting prosthesis w/ 12 socks[;] alleges no changes[;] still in process of healing." Tr. 72, 75, 77.

6

In the decision, the ALJ further stated, "This finding is also consistent with the evidence in the record of non-compliance with prosthetic follow-up, which further suggests non-disabling symptoms." Tr. 23.

Jefferson argues:

> The ALJ further claimed that his RFC was "consistent with the evidence in the record of non-compliance with his prosthetic follow-up, which further suggests non-disabling symptoms." The ALJ cited a single progress note from December 2015 in support of this finding, claiming that Mr. Jefferson "failed to follow up with his prosthetist." However, Mr. Jefferson did follow up two months later when he reported to his prosthetist at the Hanger Clinic in February 2016 that his "foot is not supporting him as it did originally, also liners and socks are wor[n] out and need to be replaced."

Doc. 22 at 16 (internal citations omitted). Jefferson also points to evidence he had no issue with non-compliance. *Id.* (citing Tr. 633, 635, 637, 639, 641).

Considered in context, the ALJ was referring not to the RFC finding as Jefferson suggests but to Dr. Hankins's finding that Jefferson is not disabled, observing Dr. Hankins's finding was consistent with evidence of noncompliance. *See* Tr. 23. The evidence of noncompliance was a December 2015 note of Bedford H. Berrey, M.D., Jefferson's orthopedic surgeon: "[Jefferson] is seen on return today still complaining of pain on the distal end of his residual limb where he has a small exostosis. He has not followed up with his prosthetist which I ask[ed] him to do to see if they can relieve his socket to provide some room for this small osteophyte." Tr. 573. Dr. Berrey was referring to a September 2015 note that Jefferson would follow-up "with his prosthetist []to have this corrected and a new socket made. He will f/u with us after he rec[ei]ves his replacement socket." Tr. 574. The ALJ did not find Jefferson has been repeatedly noncompliant and did not err in mentioning Dr. Hankins's opinion was consistent with that evidence.

7

**C.**

In the decision, the ALJ stated, "As for the opinion evidence, the record contains no opinions by the treating sources that indicate greater limitations than those assessed in this [RFC]." Tr. 23.

Citing *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988), and cases from other circuits, Jefferson argues "a lack of opinion evidence from treating or examining doctors is not evidence that Mr. Jefferson is unlimited functionally or can sustain the performance of particular tasks at requisite levels." Doc. 22 at 17. The Court does not read the ALJ's statement to indicate she relied on the absence of opinions from treating sources for any finding. Rather, based on its place in the decision and the language used, the Court reads the statement to indicate there were no opinions from treating sources the ALJ had to weigh—as required by law—in making the decision. *See* Tr. 23. Moreover, the ALJ did not find Jefferson "unlimited functionally"; she found he has an RFC to do light work with several other limitations. *See* Tr. 17–18.

**D.**

In the decision, the ALJ explained, "An individual's [RFC] is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments." Tr. 15.

Jefferson argues the ALJ failed to address Jefferson's ability to perform sustained work activities considering his testimony—corroborated by reports from doctor visits—that he has bad days about once a week during which he has too much pain to do much of anything. Doc. 22 at 17–19. Later, he adds, "The central problem for the ALJ's analysis is that Mr. Jefferson's testimony that he has bad days when he is in too much pain to perform work activities, is uncontroverted by the record." Doc. 22 at 20–21. As the Commissioner observes, this argument "points to [Jefferson's] subjective allegations and medical examinations" and asks the Court to "re-weigh the evidence to find he was further limited than the ALJ found," which is a task that goes

8

beyond the proper scope of review. *See* Doc. 25 at 17 (quoted); *see also Moore*, 405 F.3d at 1211. To the extent this argument relies on the ALJ's evaluation of Jefferson's reports of pain, the evaluation is discussed below.

### III.

In the decision, the ALJ summarized Jefferson's allegations and explained how she arrived at the RFC despite that his allegations suggest greater limitations:

> In terms of his alleged physical impairment since the alleged onset date, the objective medical evidence and course of treatment do not support the degree of limitation alleged. While the claimant alleges that he has been disabled since January 2014, the objective medical evidence at that time fails to show more than a complaint of left knee tenderness for [which] the claimant sought emergency department treatment. In particular, examination findings were fairly benign, consistent with a normal range of motion of the left knee without swelling. The claimant was released with a prescription for Mobic and he was provided a custom work release. There is no further indication of left knee issues after this one-time evaluation with limited treatment.
>
> In terms of his right lower extremity impairment, the objective evidence is consistent with a traumatic right ankle fracture and dislocation in February 2014 that resulted in a below the knee amputation followed by a brief course of inpatient rehabilitation. While he was fitted with a prosthetic device in April 2014, the record shows that he was independent in all transfers and activities of daily living with a removable cast, using crutches for ambulation at that time. He continued to demonstrate gains in functional mobility. With the use of a prosthetic device, he was able to ambulate as tolerated, as reflected in the treating source notes dated May 2014 from the UF Bone and Joint Center. There was no evidence of bony prominence on examination. Furthermore, he was using only Aleve for pain control, acknowledging that his pain was improved. There is no indication of any significant issues with his prosthesis from May 2014 until August 2014, when he reported pain with wearing his prosthesis, consistent with findings of synostosis formation by radiography. However, there was no evidence of muscle wasting or tenderness of the limb and he maintained full range of motion of the right knee. The claimant required a sizing adjustment at that time and subsequently acknowledged doing well after resizing in September 2014, using his prosthesis 5 hours a day. Nonetheless, he was

9

informed that he should be using the prosthesis the entire day without pain or functional limitations.

While the claimant was advised that he would be given a written work release when standing all day, there is no indication that a release was provided. However, the claimant acknowledged on subsequent evaluation in January 2015 that he was doing well, except for some shrinkage of the limb causing looseness requiring adjustment. There was no evidence of acute osseous abnormality and his synostosis improved, as shown by radiography. Likewise, the notes from Hangar Prosthetics dated April 2015 demonstrate no significant areas of pressure; he had [a] comfortable and supportive sock fit. The claimant could ambulate safely and sit/stand without problem. The claimant acknowledged that the leg was feeling "nice" and he was very pleased with the outcome of modifications, as noted in September 2015. He had the ability or potential for use of the prosthetics for activities that exceeded basic ambulation skills, such as that of normal community ambulation and activities consistent with an active adult or athlete.

While there is evidence of a small exostosis in December 2015, the claimant failed to follow up with his prosthetist, which suggests that this issue resolved or was not significantly limiting. Additionally, there is evidence that the claimant required new liners and socks in February 2016, which were delivered in March 2016 and the claimant acknowledged no issues with the socket fit, further acknowledging that he was satisfied.

Despite a slip injury to his residual limb in April 2016, the claimant did not require aspiration as the swelling had improved and his range of motion remained well-preserved without pain. He required a shrinker to provide necessary compression to the distal stump and conservative treatment with ice, elevation and Aleve. Nonetheless, this treatment regimen was not intended for [a] long-ranging period, and there is no indication of medical treatment after April 2016, which suggests that his injury resolved. Overall, the objective medical evidence and course of treatment is consistent with a traumatic injury resulting in a below the knee amputation, treated with a prosthetic device with good response, despite a need for intermittent adjustments and modifications to the prosthesis. Nonetheless, the medical record establishes that the claimant is capable of light work within the assessed residual functional capacity.

In terms of his cervical impairment, the objective evidence is consistent C3-4 disc herniation with stenosis and multilevel disc bulges, as confirmed by MRI in June 2014, following a motor vehicle accident.

Despite these radiographic findings, there is no indication of ongoing neck or back complaints, abnormal clinical findings, or medical treatment after August 2014.

In assessing the claimant's testimony and statements, the totality of the evidence does not support the degree of limitation alleged or preclude all work activity. Although the claimant has described daily activities that are fairly limited, several factors weigh against considering these assertions as strong evidence of disability. While the claimant asserted few activities of daily living, he is able to care for his personal needs and prepare simple meals. While his mother performs most of the household chores, he has not testified to an inability to perform such chores. In addition, he is able to drive, visit with neighbors and his cousin, and go to the park. Furthermore, he recently acknowledged that his life mainly focuses on helping his elderly parents (Exhibit 13F). Even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the objective medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors, as discussed in this decision, including the medical opinions of record.

Consistent with SSA authorities, a review of the earnings record prior to the alleged onset date shows limited earnings, including no earnings from 2007 through 2011, which is not fully consistent with disabling impairments as of the alleged onset date impacting the earnings record. (Exhibit 5D). Additionally, the claimant has worked after the alleged onset date. While these earnings do not constitute substantial gainful activity, they do show that his activities of daily living were at times, at least greater than fully acknowledged in testimony since the alleged onset date.

Furthermore, there is evidence of noncompliance with prosthetic follow-up treatment, which supports a finding of non-disabling symptoms and limitations. While the claimant testified that he elevates his right leg during the day, this restriction was given after a slip injury in April 2016 and was not intended to be permanent, but only during a temporary period of recovery. The claimant's lack of ongoing and significant medical intervention since April 2016, is consistent with this injury having resolved. Furthermore, while the claimant was initially treated with narcotic pain medications, his treatment regimen changed to over-the-counter Aleve, which suggests that his earlier complaints of pain improved with treatment and adjustments to his prosthesis.

> For all of the above reasons, the undersigned finds that the claimant's testimony and statements do not support the degree of limitation alleged or preclude all work activity. The undersigned acknowledges, however, that the claimant has some functional difficulties since his alleged onset date and has assessed a residual functional capacity for no more than light work with additional postural and environmental restrictions. The undersigned finds that this assessed residual functional capacity adequately takes into account all of the claimant's symptoms and limitations established in the medical record.

Tr. 21–23.

Jefferson points to several asserted errors in the ALJ's evaluation. Doc. 22 at 19–22.

An ALJ undertakes a two-step process to evaluate a claimant's symptoms. SSR 16-3p, 2017 WL 5180304.[2] For the first step, the ALJ determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms. *Id.* For the second step, the ALJ evaluates the "intensity and persistence" of the claimant's symptoms and determines the extent to which the symptoms limit the claimant's ability to perform work-related activities. *Id.* In undertaking the evaluation, the ALJ will consider factors that include evidence of daily activities; the location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment other than medication for relief of pain or other symptoms; and measures taken to relieve pain or other symptoms. 20 C.F.R. § 416.929(c)(3) (2011).

---

[2] SSR 16-3p, which provides guidance on the evaluation of symptoms and rescinds SSR 96-7p, became effective on March 28, 2016. The SSA expects federal courts to review a final decision using the rules in effect when the SSA issued the decision. SSR 16-3p at n. 27. Because the ALJ issued the decision on September 23, 2016, Tr. 14–25, SSR 16-3p applies here. SSR 16-3p did not alter the methodology for evaluating symptoms; rather, SSR 16-3p eliminated use of the term "credibility" because "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p.

The ALJ undertook that two-step process, and the Commissioner's brief summarizes substantial evidence to support the ALJ's finding the evidence does not support the degree of limitation alleged. *See* Doc. 25 at 11–15.

Jefferson argues the ALJ erred in finding there was no indication Jefferson had issues with his left knee after January 2014, pointing to a doctor's note that Jefferson had had left knee pain in September 2015. Doc. 22 at 21 (citing Tr. 574–75). Jefferson is correct but shows no error. The ALJ did not materially base her evaluation of Jefferson's testimony on this misstatement. *See generally* Tr. 21–23.

Jefferson argues the ALJ erred in asserting there was no indication of medical treatment after April 2016 to suggest his injury had resolved, emphasizing that the administrative hearing was just two months later and he testified that he sees the doctor who performed the amputation every two or three months, he visits the prosthetic clinic, and he is supposed to go back for surgery on his left knee and his right leg at the place of amputation. Doc. 22 at 21. But as the Commissioner observes, Jefferson submitted no evidence after the hearing and before the ALJ's September 2016 decision, and the absence of post-April 2016 treatment was just one of many factors in the ALJ's decision. *See* Doc. 25 at 16–17.

Pointing to the ALJ's statement, "Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors, as discussed in this decision, including the medical opinions of record," Tr. 23, Jefferson argues, "[A]s the ALJ's reliance on 'other factors' was actually erroneous, as discussed …, the ALJ's evaluation is not entitled to be sustained." Doc. 25 at 21–22. This argument fails because the ALJ properly relied on other factors. *See generally* Doc. 25 at 21–23. Besides, the ALJ added that Jefferson "described daily activities that are fairly limited" but could engage in activities that "weigh against considering these assertions as strong evidence of disability," Tr. 22, and substantial evidence supports that finding. See, for example, Tr. 44–46 (Jefferson's testimony he can drive, go to the park with friends and family, take care of his personal needs "such as dressing and

bathing [himself]," and cook meals) and Tr. 515 (Jefferson's statement indicating he had "no difficulty" in April 2014 with "work, housework, or school activities," his "usual hobbies," "getting into or out of a car," and "rolling over in bed," and little difficulty "walking 2 blocks" or "hopping").

Jefferson argues the ALJ should not have considered the absence of earnings from 2007 to 2011 as a reason to discount his allegations because the absence was due not to lack of motivation but to incarceration, which he had explained in his application. Doc. 25 at 22 (citing Tr. 161). But the ALJ referenced those years as only part of Jefferson's "limited earnings" before the alleged onset date. *See* Tr. 23 ("[A] review of the earnings record prior to the alleged onset date shows limited earnings, including no earnings from 2007 through 2011, which is not fully consistent with disabling impairments as of the alleged onset date impacting the earnings record."). As the Commissioner observes, Jefferson "had a history of poor earnings and only reported substantial earnings in one year during the prior 15 years." Doc. 25 at 16 (citing Tr. 180).

Jefferson argues the ALJ should have viewed earnings after the alleged onset date favorably—not unfavorably—to his allegations because his attempt to work for those earnings failed. Doc. 25 at 22 (citing Tr. 36). Although the ALJ could have viewed those earnings in the manner Jefferson would have preferred, it was not unreasonable for the ALJ to view them otherwise among other evidence suggesting "activities of daily living were at times[] at least greater than fully acknowledged in testimony since the alleged onset date." Tr. 23. As stated, the Court may not reweigh evidence. *See Moore*, 405 F.3d at 1211.

## IV.

At the hearing, the ALJ asked a vocational expert a hypothetical incorporating the limitations in the RFC. *Compare* Tr. 17–18 *with* Tr. 53–54. The ALJ relied on the

14

vocational expert's testimony in response to the hypothetical to find Jefferson can perform representative jobs. Tr. 25.

Relying on the other arguments in his brief, Jefferson argues the vocational expert's testimony does not support the ALJ's finding because the ALJ asked the vocational expert a hypothetical that did not include all of his limitations. Doc. 22 at 23. A vocational expert's testimony based on a hypothetical including all of a claimant's impairments may serve as substantial evidence. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011). An ALJ need not include in the hypothetical any findings she properly rejected as unsupported. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Because Jefferson's other arguments fail, this argument fails too.

*****

The Court **affirms** the Commissioner's decision and **directs** the clerk to enter judgment for the Commissioner and against Jason A. Jefferson and close the file.

The Court thanks Sarah Harriet Bohr, Esquire, for her willingness to serve as appointed counsel for Jefferson and her comprehensive briefing on his behalf.

**Ordered** in Jacksonville, Florida, on March 29, 2019.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   Counsel of Record